1
2
3
4
5
6
7
8

9          **UNITED STATES DISTRICT COURT**

10      **FOR THE EASTERN DISTRICT OF CALIFORNIA**

11              **FRESNO DIVISION**

12

13   **GINA SARGENT**,                          CASE NO. 07cv1448-BTM

14                          Petitioner,     **ORDER LIFTING STAY AND**
                                            **DENYING 28 U.S.C. § 2254**
15       vs.                                **PETITION FOR WRIT OF**
                                            **HABEAS CORPUS**
16   **DEBRA PATRICK, Warden**,

                             Respondent.
17

18          Petitioner Gina Sargent ("Sargent"), a state prisoner serving an indeterminate sentence of

19   seventeen-years-to-life for a 1982 second-degree murder conviction following a jury trial, proceeding

20   *pro se*, seeks a 28 U.S.C. § 2254 writ of habeas corpus.  Sargent challenges the California Board of

21   Parole Hearings' ("Board") decision to deny her parole on February 1, 2006, at her twelfth suitability

22   hearing in the then-twenty-fourth year of her sentence.  She raises six grounds for relief, alleging

23   among other things violations of her federal due process and state law rights associated with the

24   hearing and the result.  Respondent filed an Answer (Dkt No. 16), and Sargent filed a Traverse (Dkt

25   No. 21).  Respondent concedes the Petition is timely under 28 U.S.C. § 2244(d)(1) and is not subject

26   to any other procedural bar.  (Dkt No. 16, 3:7-13.)

27          On November 25, 2008, this case was reassigned for all purposes from the bench of the Eastern

28   District of California to the undersigned visiting judge.  (Dkt No. 22.)   By Order entered

1    March 18, 2009, the Court stayed the matter in anticipation of the Ninth Circuit's *en banc* decision on

2    rehearing of <u>Hayward v. Marshall</u>, 512 F.3d 536 (9th Cir. 2008), *reh'g en banc granted by* 527 F.3d

3    797 (9th Cir. 2008), *vacated by* <u>Hayward v. Marshall</u>, 603 F.3d 546 (9th Cir. 2010) (*en banc*).  (Dkt

4    No. 25.)  The *en banc* decision issued April 22, 2010.  Among other things, that decision has answered

5    the questions for this Circuit "whether federal constitutional law imposes on the states a requirement

6    for some quantum of evidence to support a state's denial of parole," and "whether, even if there is no

7    general federal quantum of evidence requirement, applicants for parole in California, under the state's

8    current laws, may obtain federal habeas review of whether there is 'some evidence' supporting a

9    negative parole decision."  <u>Hayward</u>, 603 F.3d at 549.  The Court now lifts the stay and reaches the

10   merits of Sargent's cognizable claims, applying the clarified review standards.  For the reasons

11   discussed below, the Petition is **DENIED**.

12   **I.     BACKGROUND**

13        In her Petition, Sargent summarizes:

14              On April 21, 1982, Petitioner was sentenced to 17 years to life
             for the murder of Ilana Sargent with whom Petitioner had a relationship
15           [as Ilana's stepmother].  Petitioner pushed Ilana down several stairs in
             anger.  Petitioner thought Ilana was fine, however later Ilana got sick,
16           was sent to the shower where she passed out.  Petitioner got help and
             Ilana was rushed to the hospital.  Petitioner remained with Ilana.  Ilana
17           died on November 21, 1980.  Petitioner was arrested and released on
             her own recog[nizance].  Later a $1,000 bail was posted.  Petitioner was
18           eligible for parole on December 24, 1990.  [¶]  In 2006, a Parole
             Consideration hearing was held before the Board of Prison [*sic*]
19           Hearings.  Petitioner was found unsuitable for the 12th time.

20   (Dkt No. 1, p. 19.)

21        The February 2006 parole suitability hearing transcript provides additional factual detail about

22   the circumstances of the crime.  Although Sargent exercised her right not to discuss the details again

23   at that hearing, the panel elaborated the circumstances from her probation report and from her

24   statements for prior parole suitability hearings.  In particular, the five-year-old child died after a weeks-

25   long period of mental and physical abuse culminating in Sargent pushing her down the stairs, resulting

26   in the ultimately fatal head injury.  (Dkt No. 1, 61:6-63:10.)  At the time, Sargent had a history of drug

27   and alcohol abuse.  A jury convicted her in Amador County Superior Court Case No. 11282 of second

28   degree murder (CAL. PEN. CODE § 187), and three violations of CAL. PENAL CODE § 273(d) (child

1  endangerment, corporal /traumatic injury to a child, and cruelty to a child counts).  She was sentenced

2  in May 1982 to fifteen years to life, the base term for second-degree murder  under CAL. PENAL CODE

3  § 190, plus an additional two-year enhancement.  (Id., 56:7-16.)

4       Sargent's 2006 suitability hearing proceedings and the Board's denial rationale are discussed

5  below.  A February 7, 2007 Order from the Amador County Superior Court denying her habeas corpus

6  relief  is the only reasoned state court decision to address her challenges to that result.  (Dkt No. 1, Pt.

7  1, pp. 41-42.)  The California Court of Appeal and the California Supreme Court summarily denied

8  her subsequent habeas petitions to those courts on March 1, 2007 and August 29, 2007, respectively.

9  (Id., pp. 39, 40.)

10 **II.     DISCUSSION**

11      **A.     Legal Standards For Federal Habeas Relief**

12      A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person

13 in custody pursuant to the judgment of a State court only on the ground he is in custody in violation

14 of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  A state's

15 interpretation of its own law is binding on federal habeas courts. Estelle v. McGuire, 502 U.S. 62, 68

16 (1991) (federal courts may not "reexamine state-court determinations on state-law questions"); Jackson

17 v. Ylst, 921 F.2d 882, 885 (9th Cir. 1990) (federal courts "have no authority to review a state's

18 application of its own laws").

19      Federal habeas petitions filed after April 24, 1996 are governed by the Antiterrorism and

20 Effective Death Penalty Act of 1996 ("AEDPA").  See Lindh v. Murphy, 521 U.S. 320, 322-23 (1997);

21 Byrd v. Lewis, 566 F.3d 855, 859 (2009).  AEDPA establishes a "'highly deferential standard for

22 evaluating state-court rulings,'" requiring "that state-court decisions be given the benefit of the doubt."

23 Woodford v. Visciotti, 537 U.S. 19, 24 (2002), quoting Lindh, 521 U.S. at 333 n.7.  The petitioner has

24 "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C.

25 § 2254(e)(1).  Federal habeas relief is warranted only if the result of a claim adjudicated on the merits

26 by a state court "was contrary to, or involved an unreasonable application of, clearly established

27 Federal law, as determined by the Supreme Court of the United States," or "was based on an

28 unreasonable determination of the facts in light of the evidence presented in the State court

proceeding." 28 U.S.C. § 2254(d); *see* Bell v. Cone, 535 U.S. 685, 694 (2002); *see also* Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) ("[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."), *citing* 28 U.S.C. § 2254(d)(2).  A federal court applies AEDPA standards to the "last reasoned decision" by a state court.  Campbell v. Rice, 408 F.3d 1166, 1170 (9th Cir. 2005); *see* Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding the judgment or rejecting the same claim rest upon the same ground.").

**B.     Due Process Review Standards Applicable To Denials Of Parole**

**1.     Federal Standards Of Review**

A due process claim raises two questions:  "the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient."  Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 460 (1989) (citations omitted).  "[A]n individual claiming a protected interest must have a legitimate claim of entitlement to it" arising either from "the Due Process Clause itself" or from "the laws of the States."  Id. (citation omitted).  Sargent's claims presume a state prisoner has a liberty interest in parole.  Both the Ninth Circuit and the California Supreme Court "have been engaged in modification of the law to determine what limits there are on denial of parole."  Hayward, 603 F.3d. at 552 ("Hayward's appeal addresses what if anything the federal Constitution requires as a condition of denial of parole."), *citing* 28 U.S.C. § 2254(a).  The *en banc* Hayward court held California state prisoners have a liberty interest in release on parole and clarified the standards federal habeas courts in this Circuit must apply in reviewing California prisoners' due process challenges to parole denials.[1]

In particular, one question presented was whether "federal constitutional law imposes on the states a requirement for some quantum of evidence to support a state's denial of parole."  Hayward, 603 F.3d at 549.  The majority opinion distinguished the deprivation of good time credits earned by

---

[1]  The Hayward *en banc* court also held a Certificate Of Appealability is required to appeal a district court's Order denying a writ of habeas corpus for a denial of parole.  Hayward, 603 F.3d. at 554-55.

1 prisoners while incarcerated, creating "a liberty interest of the most fundamental sort," from denial of

2 release on parole, a decision entailing the "discretionary assessment of a multiplicity of

3 imponderables." Id. at 557; *see also* id. at 555 n.44.  The Hayward court held: "in the absence of state

4 law establishing otherwise, there is no federal constitutional requirement that parole be granted in the

5 absence of 'some evidence' of future dangerousness or anything else." 603 F.3d at 561.  "We overrule

6 any decisions suggesting that the federal constitution imposes a requirement of 'some evidence' of

7 future dangerousness without regard to state law."[2] Id., at 563.

8          Although the due process clause does not, by itself, entitle a
           prisoner to parole in the absence of some evidence of future
9          dangerousness, state law may supply a predicate for that conclusion.
           "[D]espite the necessarily subjective and predictive nature of the
10         parole-release decision, state *statutes* may create liberty interests in
           parole release that are entitled to protection under the Due Process
11         Clause."

12 Hayward, 603 F.3d at 561, *adding emphasis and quoting* Bd. of Pardons v. Allen, 482 U.S. 369,

13 371 (1987).

14          California has created by statute a liberty interest in parole reviewable by federal habeas

15 courts.[3]  Hayward, 603 F.3d at 563 ( the "right in California to parole in the absence of some evidence

16 of one's future dangerousness to the public arises from California law").  The "crucial determinant of

17 whether the prisoner gets parole in California is 'consideration of the public safety.'" Hayward, 603

18 F.3d at 561-62 *citing* In re Lawrence, 44 Cal.4th 1181 (2008) *and* In re Shaputis, 44 Cal.4th 1241

19 (2008). "[T]he California Supreme Court established in [those] two decisions . . . that as a matter of

20 state law, 'some evidence' of future dangerousness is indeed a state *sine quo non* for denial of parole

21 in California." Id. at 562.  If evidence establishes that "necessary predicate for denial of parole," the

_____

23      [2] "To the extent our prior decisions including Biggs v. Terhune[, 334 F.3d 910 (9th Cir. 2003)], Sass v.
   California Board of Prison Terms[, 461 F.3d 1123 (9th Cir. 2006)], Irons v. Carey[, 505 F.3d 846, 850-51 (9th
24 Cir. 2007)] and our panel decision in this case might be read to imply that there is a federal constitutional right
   regardless of whether state law entitles the prisoner to release, we reject that reading and overrule those decisions
25 to the extent they may be read to mean that." Hayward, 603 F.3d at 555 (footnotes omitted).

26      [3] The *en banc* majority declined to decide "whether the California parole scheme establishes a predicate
   for imposing [the liberty interest] as a matter of federal constitutional law." Hayward. 603 F.3d at 562 (finding
27 it need "not decide whether a right arises in California under the United States Constitution to parole in the
   absence of some evidence of future dangerousness" because "State law already does what Hayward would have
28 federal constitutional law do").

due process standard is satisfied. Id. at 552. "There was some evidence of future dangerousness, so [Hayward's] parole was [properly] denied, and the district court correctly denied the writ." Id. at 563.

The Ninth Circuit succinctly extracted pertinent holdings from the Hayward opinion in Pearson v. Muntz, 606 F.3d 606 (9th Cir. 2010). It is "state law that gives rise to 'interests' on the part of state prisoners that may be enforced as a matter of federal law." Pearson, 606 F.3d at 609. Federal courts "must apply the California 'some evidence' test on federal habeas review under AEDPA." Id. at 608. "[F]ederal habeas courts *must* 'decide whether the California judicial decision approving the governor's decision rejecting parole was an "unreasonable application" of the California "some evidence" requirement, or was "based on an unreasonable determination of the facts in light of the evidence.""[4] Id., *quoting* Hayward, 603 F.3d at 563. "By holding that a federal court may review the reasonableness of the state court's application of the California 'some evidence' rule, Hayward necessarily held that compliance with the state requirement is mandated by federal law, specifically the Due Process Clause." Id. at 609.

Inasmuch as "Hayward specifically commands federal courts to examine the reasonableness of the state courts' application of the California 'some evidence' requirement, as well as the reasonableness of the state court's determination of the facts in light of the evidence," the federal court must review "*how* the state court applied the requirement." Pearson, 606 F.3d at 609, *quoting* Hayward, 603 F.3d at 562-63. A parole denial is not justified "merely because the state court purported to identify some evidence of future dangerousness;" there must actually be " 'some evidence of future dangerousness' justifying the denial of parole." Id. "[I]t is not enough that there is some evidence to support the factors cited for the denial; that evidence must also rationally support the core determination required by the statute before parole can be denied, *i.e.*, that a prisoner's release will unreasonably endanger public safety." In re Roderick, 154 Cal.App.4th 242, 263, 264 (2007) ("Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety.").

---

[4] The Governor may review the Board's parole decisions and is authorized to reverse or modify them, applying the same standards as the Board. CAL. CONST. art. V, § 8, subd. (d); CAL. PENAL CODE § 3041.2.

## 2.     California Parole Statute And Parole Denial Standards Of Review

Under California law, prisoners subject to indeterminate life sentences with the possibility of parole "may serve up to life in prison, but they become eligible for parole consideration after serving minimum terms of confinement." In re Dannenberg, 34 Cal.4th 1061, 1078 (2005). "[L]ife inmates' actual confinement periods within the statutory range are decided by [the Board of Prison Terms]." Id. The Board must make parole decisions in the manner prescribed by CAL. PENAL CODE § 3041 and implementing regulations, applying "detailed standards" to evaluate "whether an individual is unsuitable for parole on public safety grounds." Id. at 1096 n.16; see In re Rosenkrantz, 29 Cal.4th 616, 677 (2002) (the Board's discretion is circumscribed by the requirement that "the decision must reflect an individualized consideration of the specific criteria and cannot be arbitrary and capricious"). The Board must consider both circumstances tending to show suitability[5] and circumstances tending to show unsuitability[6] in the particular case. The regulations prescribe how the evidence is to be treated:

> All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during, and after the crime; **past and present attitude toward the crime**; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

---

[5] Guideline circumstances tending to show suitability include:  (1) no juvenile record; (2) reasonably stable social history; (3) signs of remorse, such as performing acts or giving "indications he understands the nature and magnitude of the offense;" (4) the crime was the result of significant personal stress; (5) lack of any significant history of violent crime; (6) the prisoner's present age as reducing the probability of recidivism; (7) realistic plans for the future upon release, or development of marketable skills usable upon release; and (8) institutional behavior "indicating an enhanced ability to function within the law upon release." CAL. CODE REGS., tit. 15, §§ 2402(d), 2281(d).

[6] Guideline circumstances tending to show unsuitability include:  (1) the heinousness or cruelty of the commitment offense; (2) the prisoner's previous record of violence, "particularly if the prisoner demonstrated serious assaultive behavior at an early age;" (3) unstable social history in relationships with others; (4) sadistic sexual offenses; (5)  psychological factors; and (6) engaging in serious misconduct while incarcerated.  CAL. CODE REGS., tit. 15,  §§ 2402(c), 2281(c).

1   CAL. CODE REGS., tit. 15, §§ 2281(b), 2402(b) (emphasis added).[7]

2       Thus, "A parole date shall be set if the prisoner is found suitable for parole under Section

3   2402(d)," but "[a] parole date shall be denied if the prisoner is found unsuitable for parole under

4   Section 2402(c)." CAL. CODE REGS., tit. 15, § 2401. While the Board must consider all pertinent

5   information, "[i]t is not the existence or nonexistence of suitability or unsuitability factors that forms

6   the crux of the parole decision; the significant circumstance is how those factors interrelate to support

7   a conclusion of current dangerousness to the public." Lawrence, 44 Cal.4th at 1212. The factors "are

8   set forth as general guidelines; the importance attached to any circumstance or combination of

9   circumstances in a particular case is left to the judgment of the panel." Id., at 1203, quoting CAL.

10  CODE REGS, tit. 15, § 2281, subds. (c), (d); see Roderick, 154 Cal.App.4th at 264 ("We read those

11  directives as mandating that the Board, in its decisions, must articulate reasons that are grounded in

12  evidence and rationally related to the statutory basis for denial."), citing, inter alia, CAL. PENAL CODE

13  § 3401(b) and Dannenberg, 34 Cal.4th at 1071. "[I]t is irrelevant that a court might determine that

14  evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating

15  unsuitability for parole." Rosenkrantz, 29 Cal. 4th at 677.

16      "Regardless of the length of time served, a life prisoner shall be found unsuitable for and

17  denied parole if in the judgment of the panel [or Governor] the prisoner will pose an unreasonable risk

18  of danger to society if released from prison." CAL. CODE REGS., tit. 15, §§ 2281(a), 2402(a). Due

19  process is satisfied if there is at least "a modicum of evidence" to support the decision. Rosenkrantz,

20  29 Cal. 4th at 676-77 ("As long as the [denial] decision reflects due consideration of the specified

21  factors applied to the individual prisoner in accordance with applicable legal standards, the court's

22  review is limited to ascertaining whether there is some evidence in the record that supports the [denial]

23  decision"). When an unsuitability determination is based on the circumstances of the offense, the

24  decision must also identify "some evidence" of aggravating facts beyond the minimum elements of that

25  offense. Rosenkrantz, 29 Cal.4th at 683. In denying parole in reliance on an aggravated commitment

26

27      [7] "The two sections are identical." Lawrence, 44 Cal.4th at 1202 n.5. CAL.CODE REGS., tit. 15, § 2402
    provides the Parole Consideration Criteria And Guidelines applicable to murders committed on or after
28  November 8, 1978. CAL. CODE REGS., tit. 15, §§ 2281 applies to murders committed before then.

offense, the Board or Governor  must also identify other evidence supporting an inference of current

dangerousness.  The <u>Hayward</u> court summarized:

> As a matter of California law, "the paramount consideration for both
> the Board [of Prison Terms] and the Governor under the governing
> statutes is whether the inmate currently poses a threat to public safety."
> . . . . The prisoner's aggravated offense does not establish current
> dangerousness "unless the record also establishes that something in the
> prisoner's pre- or post-incarceration history, or his or her current
> demeanor and mental state, supports the inference of dangerousness.
> Thus, in California, the offense of conviction may be considered, but
> the consideration must address the determining factor, "a current threat
> to public safety."[8]

<u>Hayward</u>, 603 F.3d at 562 (footnotes omitted), *quoting* <u>Lawrence</u>, 44 Cal.4th at1210, 1213-14.

While judicial review of a parole denial is "extremely deferential," the purpose of the review

is to ensure the result is supported by "some evidence."   <u>Hayward</u>, 603 F.3d at 562; *see also*

<u>Rosenkrantz</u>, 29 Cal.4th at 660; <u>Dannenberg</u>, 34 Cal.4th at 1071.  A reviewing court need only verify

that evidence of the factors recited as the reasons for denial supports the "core determination" of

present dangerousness.[9]   <u>Lawrence</u>, 44 Cal.4th at 1212 ("[T]he circumstances of the commitment

offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those

circumstances are probative to the determination that a prisoner remains a danger to the public."); *see*

<u>Id.</u> at 1227 (setting aside the Governor's action in vacating the Board's grant of parole based on the

"immutable and unchanging" circumstances of the "egregious" commitment offense, on grounds the

denial decision was not supported by "some evidence" of the prisoner's current dangerousness).

\\

---

[8]  "In sum, the Board or the Governor may base a denial-of-parole decision upon the circumstances of the offense, or upon other immutable facts such as an inmate's criminal history, but some evidence will support such reliance *only* if those facts support the ultimate conclusion that an inmate *continues* to pose an unreasonable risk to public safety.  (Regs., § 2281, subd. (a).)  Accordingly, the relevant inquiry for a reviewing court is not merely whether an inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board or the Governor."  <u>Lawrence</u>, 44 Cal.4th at 1221.

[9]  This standard disposes of Sargent's request for an evidentiary hearing on grounds "the lower courts did not resolve the issue" whether her due process rights were violated in connection with Board's 2006 decision.  (*See* Dkt No. 21, 2:25-27.)  This Court's determination does not depend on the resolution of disputed issues of fact.  No additional factual development would remove from the existing record the "some evidence" of unsuitability based on public safety concerns the Court finds supports the decision to deny parole.

**C.      Grounds One, Three, And Four Are Not Cognizable**

Sargent's Petition alleges six grounds for federal habeas relief:  (1) violation of her federal due process rights when the Board denied her parole based on her election to not discuss the life crime or admit guilt as authorized in Cal. Penal Code § 5011 ("Section 5011");[10] (2) violation of her federal due process rights for the Board's failure to cite "some evidence" in support of its determination she remained unsuitable for parole; (3) violation of her federal due process rights through the Board's continued reliance on unchanging factors to deny her parole, purportedly resulting in a *de facto* transformation of her sentence to life without parole; (4) continued denial of parole constitutes cruel and unusual punishment under the Eighth Amendment; (5) the Board used arbitrary and irrational standards in violation of her substantive due process rights; and (6) the Board violated her "presumptive" right to a parole release date "by failing to follow the law."  (Dkt No. 1, pp. 4-12.)

In Ground One, Sargent argues she had a state statutory right not to discuss the life crime at the suitability hearing, and the Board violated her Fifth and Fourteenth Amendment rights by denying her parole "based primarily on" the exercise of her Section 5011(b) right.  (Dkt No. 1, p. 7.)  The panel confirmed at the outset of the hearing Sargent elected not to discuss the commitment offense, and it relied on other descriptions of the life crime in the record to fulfill its obligation to "determine the extent of personal culpability" in discussion with the prisoner.[11]

> PRESIDING COMMISSIONER SAWYER:   Will the inmate be speaking with the panel?
>
> ATTORNEY BESHWATE: Yes, however to [*sic*] Penal Code Section 5011, she will not be discussing the life crime, she will be submitting her statements on the last several statements on the last several hearings that have occurred, as well as the prisoner's version of the offense in the Board Report from October of '05 calendar. She certainly admits her

___

[10] "(a) The Department of Corrections shall not require, as a condition for any form of treatment or custody that the department offers, an admission of guilt to any crime for which an inmate was committed to the custody of the department.  [¶]  (b) The Board of Prison Terms shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed." Cal. Penal Code § 5011.

[11] **"The facts of the crime shall be discussed with the prisoner to assist in determining the extent of personal culpability**.  The board shall not require an admission of guilt to any crime for which the prisoner was committed.  **A prisoner may refuse to discuss the facts of the crime in which instance a decision shall be made based on the other information available** and the refusal shall not be held against the prisoner. . . ." Cal. Code Regs. tit.15, § 2236 (emphasis added); *see* Cal. Pen. Code § 5011, subd. (b).

- 10 -

1    involvement and takes full responsibility; but she wants to rely upon
     her previous statements regarding the life offense. . . . [¶] [S]he'll be
2    talking about other things.

3    (Dkt No. 1, 60:9-25.)

4          Although the panel suggested that Sargent review the probation and police reports before her

5    next parole suitability hearing and that she be willing to talk about the crime, the record does not

6    support her representation she was denied parole at the 2006 hearing based on her Section 5011

7    election.  The panel did not require her to admit guilt before it would grant a parole date.  The advice

8    was given in the context of her approach at the 2006 hearing to distance herself from the life-crime,

9    to put it behind her, without mentioning the victim or demonstrating remorse or empathy.  (*See* Dkt

10   No. 16-1, 63:13-16, 56:8-57:1.)  Furthermore, parole proceedings are not part of criminal prosecutions

11   carrying particular safeguards arising from the U.S. Constitution.  On the face of her claim, the Section

12   5011 rights she invokes arise from state law, not federal law.  Federal habeas relief is not available for

13   alleged errors in the application of state law.  Estelle, 502 U.S. at 67; Jackson, 921 F.2d at 885.

14         In Ground Three, Sargent argues repeated denials of parole based on the unchanging factors

15   of "the circumstances of the offense," the "nature of the crime," and the "triviality of the motive,"

16   irrespective of her rehabilitation, transform her sentence from an indeterminate life sentence with the

17   possibility of parole to a sentence of life without the possibility of parole. (Dkt No. 1, p. 9.)  However,

18   Sargent  was  convicted  of  second-degree  murder.   She  was  sentenced  under  state  law  to  an

19   indeterminate life term.  Parole denials do not lengthen her maximum sentence of life in prison.  "[F]or

20   crimes concededly classified and classifiable as felonies, that is, as punishable by significant terms of

21   imprisonment in a state penitentiary, the length of the sentence actually imposed is purely a matter of

22   legislative prerogative."  Rummel v. Estelle, 445 U.S. 263, 274 (1980) (upholding against an Eighth

23   Amendment challenge a life sentence based on a series of non-violent property crimes imposed

24   pursuant to a state's recidivist criminal statute).  "[A] prisoner is not entitled to have his term fixed at

25   less than maximum or to receive parole."  Rosenkrantz, 29 Cal.4th at 655; *see* Greenholtz v. Inmates

26   of Nebraska Penal & Correctional Complex, 442 U.S. 1, 7 (1979) (it is well established there is "no

27   constitutional or inherent right of a convicted person to be conditionally released before the expiration

28   of a valid sentence").  Nevertheless, to the extent Ground Three may overlap with her argument in

  
1    Ground Two that the 2006 parole denial did not satisfy the "some evidence" of present dangerousness

2    due process standard, the Court finds that argument is subsumed in her Ground Two claim, addressed

3    on the merits below.

4            As Ground Four, Sargent alleges her continued incarceration as a result of repeated denials of

5    parole violates her Eighth Amendment rights. She argues her rehabilitation record satisfies the

6    statutory standards for release and her continued confinement is accordingly "arbitrary and constitutes

7    cruel and unusual punishment." (Dkt No. 1, pp. 10, 36.) She relies on <u>Furman v. Georgia</u>, 408 U.S.

8    238 (1972), a death penalty case, for the proposition:  "Punishment that is arbitrary and thus violates

9    due process may be cruel and unusual." (<u>Id.</u>, p. 25.)  While the Eighth Amendment contains "a narrow

10   proportionality principle" that applies to noncapital sentences when a sentence is extreme and "grossly

11   disproportionate" to the severity of the crime (*see* <u>Ewing v. California</u>, 538 U.S. 11, 20, 21 (2003),

12   *quoting* <u>Harmelin v. Michigan</u>, 501 U.S. 957, 996-97 (1991) *and* <u>Rummel</u>, 445 U.S. at 271), Sargent's

13   codified term-of-years-to-life sentence for murder is neither "arbitrary" nor "grossly disproportionate"

14   to her crime.  She is serving no longer than her maximum and lawfully-imposed sentence and thus fails

15   to state a cognizable Eighth Amendment claim. *See* <u>Greenholtz</u>, 442 U.S. at 7; *see also* <u>Dannenberg</u>,

16   34 Cal.4th at 1096.

17          The Court finds remaining Grounds Two, Five, and Six are facets of Sargent's overarching

18   contention her due process right to release on parole was violated by the February 2006 panel decision,

19   upheld by the state courts, and addresses that challenge on the merits below, applying the clarified

20   review standards from <u>Hayward</u>.

21          **D.    <u>Conduct And Results Of Prior Parole Suitability Hearings Are Not At Issue</u>**

22          Sargent provides as Petition exhibits transcripts of prior suitability hearings dating back to

23   1998 in support of her argument that she meets the criteria for release on parole and that her continued

24   incarceration violates due process.  Those prior hearing records were available to her 2006 panel,

25   which alluded to portions of the prior decisions and relied on some of the same supporting

26   documentation.  Her 2006 panel made similar findings and reached similar conclusions as had prior

27   panels in assessing factors of suitability and of unsuitability for parole.  To the extent Sargent provides

28   those transcripts as evidence to support her theory that successive denials of parole are converting her

1   indeterminate life sentence into a sentence of life without parole, or that those decisions individually

2   or cumulatively constitute an Eight Amendment violation, those grounds for federal habeas relief are

3   rejected above.  To the extent she may be inviting the Court to evaluate the conduct and results of

4   those prior decisions, the scope of this Court's ruling is limited to her Petition's due process challenge

5   to the February 2006 proceeding and the state's judicial review of that result based on the evidence

6   available to those authorities.

7        **E.        February 2006 Subsequent Parole Suitability Hearing**

8        The transcript of Sargent's  February 1, 2006 suitability hearing is provided as an exhibit to the

9   Petition and to the Answer.[12]   (Dkt No. 1, Pt. 1 pp. 54-158, Pt. 2 pp. 1-17; Dkt No. 16-1, pp. 6-64.)

10  Sargent, her attorney, and a deputy district attorney ("DA") participated in the proceedings.  Sargent's

11  daughter, Stephanie Boatwright, attended to support her mother's parole.  (Dkt No. 16-1, p. 6.)  One

12  of the panel commissioners read into the record a summary of prior statements Sargent had made

13  describing the crime, as well as portions of the May 7, 1982 Probation and Pre-Sentence Report.[13]

14                . . . I'm going to be talking about the crime initially here, the
                commitment offense, October 2005 Calendar, page 1, "Summary of the
15              Crime." "On 11/19/1980, at approximately 10:00 p.m., the victim was
                observed to be unconscious, but breathing, after police were summoned
16              to the home.  Miss Sargent indicated that her stepdaughter had fallen
                down the stairs, ate, took a shower, then passed out.  The child was ill
17              and had vomited.  At this time Miss Sargent went to the neighbors
                house for help.  Two doctors in the emergency room were highly
18              suspicious of the incident and noticed bruises and abrasions on the
                child that were yellowish to black and blue. A large bruise on the
19              forehead was prominent and was suggestive of an extensive head
                injury.  She was placed in the pediatric intensive care and subsequently
20              died on 11/21/1980 of acute cardio-vascular collapse, secondary to a
                massive cerebral swelling." This very brief information was taken from

21

22      [12]   The record consists of electronically-scanned exhibits accompanying the Petition (Dkt No. 1, Part 1
        and Part 2, Exhibits A through J) and the Answer (Dkt No. 16, Exhibits 1 through 10, Attachments 1
23      through 4) rather than lodgments.

24      [13]   That report (Dkt No. 16-1, pp. 67-81) identified circumstances of aggravation to be the "crimes
        involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of
25      cruelty, viciousness or callousness, whether or not chargeable as an enhancement, . . . [t]he victim was particularly
        vulnerable, . . . the defendant took advantage of a position of trust or confidence to commit the offense, . . . [and]
26      [t]he defendant has engaged in a pattern of violent conduct which indicates a serious danger to society," with a
        mitigation factor of "no prior arrest record."  (Id., p. 79.)  The officer also noted "the crimes were committed
27      within a single period of deviate behavior," no information indicated she was prone to violence "prior to the
        present series of incidents." (Id., p. 80.) The Evaluation section observes: "Although she expressed remorse over
28      Ilana's death, she i[n] no way accepts responsibility for the crime." (Id.)

the Amador County Sheriff's office report dated 11/22/1980.  Now the petitioner's version, "Sargent maintained that after she inflicted the injury to the victim the resulting emergency surgery contributed to the victim's death.  She now takes full responsibility.  She stated that she has come to realize that it was her actions alone that caused the death of the child.  Her statement is as follows, "I became upset with . . . [Ilana], my stepdaughter because of her resistance in assisting me.  I pushed Alana down the stairs.  I didn't think she was hurt.  She ate, then got sick.  I told her to go take a shower and I would be there in a minute.  She passed out in the shower.  At that time I went for help at the neighbors.  I take full responsibility for Alana's death."  Also, in prior reports she stated that there was no prior physical abuse of the victim and that she'd only spanked her one time.  She now admits Alana was abused mentally and physically.  It was progressive.  There were days when I would slap her.  The spanking left several bruises on her bottom. [Punctuation mark omitted.]  The aggravating factors in this case – "the victim was particularly vulnerable due to her young age.  Miss Sargent took advantage of a special relationship, with confidence and trust with the victim, her five-year-old stepdaughter.  The nature of the crime exhibited cruelty as Miss Sargent pushed her five-year-old stepdaughter down a flight of stairs."  Mitigating circumstances – "after finding the child past [sic] out she went to the neighbors house for help and had no prior arrest history."

(Dkt No. 16-1, 13:7-15:10; see also Id., 57-3-58:2.)

The panel then reviewed Sargent's personal and pre-commitment history.  She was 47-years-old at the time of the hearing.  (Dkt No. 16-1, 15:20.)  She had dropped out of school at age sixteen to marry, had a daughter, divorced six months later, went to live with her parents, met her step-daughter's father, Mr. Sargent, when she was twenty, and married him four months later.  Mr. Sargent gained custody of his daughter about seven months before the child's death.  She received state aid and income from her part time work at a hamburger stand.  (Id., 17:1-12.)  She had used drugs (methamphetamine, cocaine, and marijuana) beginning at age fifteen, began drinking at age eighteen, and abused both from age twenty to twenty-three, through and including the time of the commitment offenses.  (Id., 17:14-19.)  She and Mr. Sargent divorced in 1985.  She had no prior criminal record.

Turning to Sargent's parole plans, the panel confirmed she intended to live with her mother or, alternatively, she had been accepted into a group home.  (Dkt No. 16-1, 19:20-24, 21:7-16.)  She provided letters from her sister, aunt, and mother urging her release and offering support, a home, and a vehicle.  (Id., pp. 22-23, 25:5-11.)  She had an AA sponsor on the outside, she planned to complete a general education Associates degree she had started while incarcerated, and she planned to work in

07cv1448

the dental prosthetics field.  She had letters of interest from potential employers and discussed realistic employment objectives.  (<u>Id.</u>, 20:10-21:2.)  She provided updated letters from her AA sponsor and a recent actual job offer.  (<u>Id.</u>, 25:16-28:21.)  A letter from the Prison Industry Authority ("PIA") substantiated Sargent had started working in the dental lab in 1999 and rated her an accomplished lab tech.  (<u>Id.</u>, 26:15-19.)  The panel summarized:  "Good work ethic, high standard of work quality, earned certificates in set-up, shipping receiving, finishing and metal casting.  Get along well, patient teacher when helping other inmates learn the trade.  Upon release, very employable, 'especially of [*sic*] her expertise in metal casting.'"  (<u>Id.</u>, 26:22-27:1.)  One commissioner observed:  "You've got a nice package there."  (<u>Id.</u>, 28:21.)  She provided additional positive details about her parole plan options in response to DA questioning.  (<u>Id.</u>, pp. 43-46.)

Turning to Sargent's conduct while incarcerated, the panel reviewed relevant factors interactively with her.  Since she was received in prison in May, 1982, she had never had any 115 disciplinary writes-ups, but had eight 128s for less serious conduct, the most recent for having words with staff about five and one-half years before the February 2006 suitability hearing.  (Dkt No. 16-1, 29:5-30:1.)  She had obtained her GED within a year or two of her incarceration and had about five or six classes to complete toward her Associates degree through Coastline Valley College, where she was currently enrolled.  (<u>Id.</u>, 30:3-18.)  Her programming participation since her last suitability hearing in 2004 included completion of vocational dental and vocational word processing while she remained in PIA dental, and she had received "exceptional work reports" as a lab tech and teaching assistant.  (<u>Id.</u>, 30:22-31:13.)  She had been "very active and consistent in [her] participation in AA during this entire period."  (<u>Id.</u>, 31:13-19.)  She confirmed she was "still working the 12 Steps," had ordered by mail an additional 12 Step program, and displayed her knowledge of the steps.  (<u>Id.</u>, 31:22- 32:24.)

Sargent had completed several self-help programs since her most recent prior hearing, including Creative Conflict Resolution, Parenting, an art meditation group, and she volunteered in Peer Health.  (Dkt No. 16-1, 32:24, 33:1.)  She had a September 2005 chrono from a correctional officer noting she had been "a model inmate" in recent years, getting along well with staff and prisoners alike.  (<u>Id.</u>, 33:2-12.)  She had an August 2005 chrono describing her "professional attitude" with respect to her participation in Protestant Chapel.  (<u>Id.</u>, 35:2-4.)  She had participated in two crime-specific group

sessions in 2003 and September 2004 (Domestic Violence Group), and in anger/stress management group in June 2004.  (Id., 34:17-35:1.)  She identified a new training program through the dental lab she was currently taking.  (Id., 35:10-21.)

The panel noted Sargent's most recent psychological evaluation was by forensic psychologist Steven Walker dated April 17, 2003, the same evaluation as had been used at her 2003 and 2004 suitability hearings.  That report provided an overview of all her prior evaluations, then gave Dr. Walker's diagnostic impression:  "Axis 1 – alcohol dependence in sustained, full remission in a controlled environment; and poly-substance dependence, cocaine, amphetamine and alcohol in fully sustained remission in a controlled environment; with a Global Assessment Function ["GAF"] of 92." (Dkt No. 16-1, 36:16-26.)  The commissioner summarized:

> The doctor then goes on to discuss the various assessments that are done in order to evaluate a  risk of dangerousness if released to the community.  Under the  history/background assessment he found that you presented as a moderately low risk for future violence.  In the clinical presentation he stated that your present low risk for future violence[] and in the management of future risk, "the inmate presents a low risk for future violence."  He makes a comment in the conclusion that, "She does present as a primary substance abuser and a positive prognosis for a successful parole will remain consistent as long as abstinence is maintained.  The inmate does evidence a help-seeking orientation and has programmed well while in prison.  So the risk assessment measures suggest that the inmate posse[sses] a low likelihood of becoming involved in a violent offense if released into the community.  This estimate takes into account the inmate[']s cultural background, language issues if any, personal, social and criminal history, institutional programming, community and social support, release plans and current clinical presentation.  In addition there is the caveat that such an assessment is at least partially based on the likelihood of keeping you abstinent from any substance abuse." [¶] Then the doctor goes on to talk about your being discipline free with a classification score of zero.

(Dkt No. 16-1, 36:27-38:3.)

Sargent confirmed she had participated in AA regularly since 1987 and had been at times Chair, Vice-Chair, Secretary, and Sargeant of Arms of the group.  (Dkt No. 16-1, 38:15-24.)  The program gives her "structure for a way to live my life, which is what I didn't have before."  (Id., 39:9-11.)  She anticipated she would find life outside prison changed and "much faster than when I was out there."  (Id., 39:21-23.)  She intended to create structure for herself after institutional life by "going to work, that type of thing, going to meetings" such as AA and her church.  (Id., 40:3-7, 40:21-24.)

The DA was not permitted to ask Sargent about the life offense at the hearing because of her Section 5011 election not to speak about it. (Dkt No. 16-1, 41:3-14.) In response to his question whether Sargent felt she still had an anger problem, she responded she still got angry, but was "much more mature than I was at twenty-four when I came to prison," having "learned ways to deal with anger instead of just lashing out. . . ." (Id., 41:24-42:7.) With respect to substance abuse, she acknowledged "I'll always be an alcoholic," but had selected a program "structured around AA, I have [a] sponsor, my church is very important to me, my foundation," and "I always know that if I start drinking, it's over," observing her other prior substance abuse started with alcohol, "so I figure if I stay away from that I can pretty much stay away from the other." (Id., 42:8-23.) She replied to the question whether she believed her drug use had been out of control:

> INMATE SARGENT: Oh, absolutely. My whole life was out of control, the alcohol, drug abuse, all of it. The anger, all the emotions that I didn't know how to deal with that just came out because I didn't know how to deal with them. Yes, everything was out of control.

(Dkt No. 16-1, 43:1-8.)

In his closing remarks, the DA stated the County's position that "Miss Sargent at this time, is not suitable for parole." (Dkt No. 16-1, 47:26-48:2.) The DA argued:

> First and foremost of [sic] the vulnerability of the victim, the age of the victim, the cruel and haneous [sic] nature of the crime. Not just the crime itself that resulted in the child's death, but the multiple acts of abuse that took place prior, indicating that this was not a one-time incident. The Probation Report coupled with the autopsy report lists [ninety-seven] scars, numerous bruises, eighty-five bruises on the lower extremities. In effect, the child's body was covered with some type of injury. The period of abuse appears to be a one to two-month period. There was the October of 1980 situation, which the child, suffering from chicken pox[], was left outside while the inmate drank alcohol with some friends inside a residence. Then this offense took place, culminating in the death of [the] child on November 21, 1980. It seems that there are still questions that remain about exactly how the child died, noting in the Probation Report the number of doctors and experts who were involved (indiscernible) that the injuries would not seem to result from a push or fall down a flight of stairs. One of the doctors felt that the delay in the child receiving medical assistance may have contributed to the child's death. The inmate has indicated that the child was unconscious, but the child seemed to be reactive; and thinking that a child would fall down a flight of stairs wouldn't result in an injury seems to be somewhat self serving. There are issues of alcohol and substance abuse and obviously the fact that the inmate was in a position of trust and authority over this child. She obviously has taken steps in order to transition into the community. I would just point out that while

- 17 -

1        she definitely has some plans there are some questions remaining about
         certain [*sic*] she will be able to put those plans into effect. . . .\

2

3    (Dkt No. 16-1, 48:2-49:15.)

4        Sargent's attorney argued in favor of her parole:

5            . . . I thought the best place for me to start is taking a paragraph from
             the current, October '05 Board report, and I'll just quote: [¶] "Inmate
             Sargent continues to meet the expectations set forth by the BPT as
6            demonstrated by her continuous efforts in gaining (indiscernible) as
             well as employable skills.  She has remained disciplinary free with no
7            serious or administrative CDC 115s since reception.  She has
             demonstrated the capacity to obtain and hold an assignment as
8            evidenced by her excellent performance in PIA dental.  She's taken
             advantage of the self-help programs, including Alcoholics Anonymous.
9            She has a positive attitude and has developed the skills necessary to
             succeed outside a prison setting.  She has learned skills to prepare
10           herself to be sufficient in society and has, more importantly, family
             support.  She has taken advantage of the courses in CDC to improve
11           herself."

12   (Dkt No. 16-1, 49:18-50:13; *see also* <u>Id.</u>, pp. 50-52 (reviewing multiple suitability factors supported

13   by the record).)

14       Sargent briefly addressed the Board with remarks focused on her personal progress, without

15   mentioning her step-daughter or her perspective and feelings about the life-crime:

16           I believe – I know who I was back in 1980 and I was a very
             immature person who didn't think of consequences, who didn't think of
17           what my actions would do or cause or how it would affect anyone.  I'm
             not – I mean, I'm the same person, but I'm totally, totally changed.  I
18           think about how what I say and what I do – how it's going to affect a
             person.  I don't just fly off the handle without thinking, what could this
19           possibly do to me, to someone else, to – I just think that with my age,
             my maturity, the choices, the decisions that I make based on my morals
20           and my ethics that I didn't really focus on at that time – I just think that
             at this time that I could be – like I say, from one structure into a
21           different type of structure, that I would be fine out there and that I could
             be a productive person in society and I would hope that you would give
22           me that chance today, and I thank you.

23   (Dkt No. 16-1, 52:21-53:13.)

24       After its recess for deliberations, the panel returned with its "difficult decision" to deny Sargent

25   parole for another year.  (*See* Dkt No. 16-1, pp. 54-63, 54:18.)  The panel informed her they had

26   focused carefully on her history and all the material of record, finding her a "tough case" because she

27   had "loaded up" the positive side of the scale "really well" in terms of the work she had done while in

28   custody and in "connecting to the outside."  (<u>Id.</u>, 55:8-16.)  "You're doing fine, whoever checks your

                                          - 18 -                                    07cv1448

work in your 12 Step program seems to be very satisfied and the back page said 'good work' on the check offs, on the work that you've done, and the organization that you got [with] all your material . . . you should be congratulated on that." (Id., 54:25-55:5.)   The panel also commended Sargent for her parole plans, her programming, her job offers, her marketable skills, the good work reports, and one panel member observed:  "I see you getting out of here." (Id., 55:19:56:6.)  The panel reviewed in detail the record of her accomplishments, noted her lack of a prior criminal record, the absence of any serious misconduct while  in prison, her educational, vocational, and self-help accomplishments, her solid parole plans, her outside support, and her favorable recent psychological reports. (Id., pp. 60-63.) Despite those positive factors, the panel discussed the circumstances surrounding the commitment crimes in support of its decision to deny parole:

> PRESIDING COMMISSIONER SAWYER:  The summary of the crime on 11/19/1980, the victim, Alana [sic] Sargent, age 5, was observed to be unconscious, but breathing, after police were summoned to the home.  You indicated that your stepdaughter had fallen down the stairs, took a shower, passed out, the child was ill and vomited.  At the time you went to a neighbor[']s house for help.  Two doctors at the emergency room were highly suspicious of the incident, notice[d] bruises and abrasions, they were yellowish to black and blue.  A large bruise on the forehead suggested an extensive head injury.  She was placed in a pediatric intensive care and subsequently died on 11/21/1980 of acute cardi[o]-vascular collapse, secondarily to the massive cerebral swelling.  The crime in this case is certainly cruel and callous.  It was carried out over a period of time.  This is – what I just read in the Board report was a very brief, very brief, description of what had been happening and what happened.  It demonstrates an exceptional callous disregard for human suffering.  There was no motive for this, other than [the child's lack of] cooperation. The crime was inexplicable in terms of a motive.

(Dkt No. 16-1, 57:3-58:2.)

> Despite the one-year denial result, the panel observed:

> The scales are certainly going in your direction.  There's nothing you can do about changing the crime, we all know that, but you might again want to review the Olsen File and those reports that I mentioned. . . . So stay discipline free, continue your self-help, and earn those positive chronos. . . .

(Dkt No. 16-1, 63:12-20.)

Sargent provides as a Petition exhibit a letter her attorney wrote to her on February 7, 2006, the week after the hearing, to elaborate the panel's reasoning, as they had explained it to him, in

- 19 -

07cv1448

particular the import of its suggestion that she consider and acknowledge at her next Board review the contents of the police and other reports of the crime.  (Dkt No. 1, p. 52.)  The factors counsel emphasized in his letter are all discernable in the hearing transcript and the panel's statement of decision.  First, with respect to the suggestion that she review the official reports describing the life offense, he identified their concerns:  "the extent of the abuse that you have been discussing with the panels is less than what is indicated in the official reports;" "you need to get a handle on the significant abuse that you had admitted to leading up to the event, and not that it was just an isolated incident where something bad happened, but that this had been going on for one to two months;" and "you need to be able to convey the depth and breadth of your own responsibility to them by focusing on all your acts, not only the acts that led to the life offense."  (Id.)  Second, "the panel was concerned that your statements really didn't include anything about the victim;" the victim must be "in your mind and in your thoughts when you are discussing the life offense;" the focus "isn't about people feeling sorry for you," but rather "it's about you feeling remorse for the life that you are responsible for taking;" and the panel found "nothing said at the hearing that showed that you were remorseful or sorry nor did you make any statements regarding the victim in your closing."  (Id.)  He advised her "the panel thought that if you could convey [those things] in a more open and appropriate manner, that you are probably going to get a date within the next couple of years."  (Id.)

**F.**   **"Some Evidence" Supports The 2006 Parole Denial, Satisfying Due Process**

As construed by the Ninth Circuit in Hayward, federal habeas courts reviewing state judicial decisions must apply California's "some evidence" of present dangerousness due process standard:

> Since the "some evidence" requirement applies without regard to whether the United States Constitution requires it, we in this case, and courts in this circuit facing the same issue in the future, need only decide **whether the California judicial decision approving the governor's decision rejecting parole was an "unreasonable application" . . . of the California "some evidence" requirement, or was "based on an unreasonable determination of the facts in light of the evidence."**

Hayward, 603 F.3d at 562-63, *quoting* 28 U.S.C. §§ 2254(d)(1)-(2); *see also* Id. at 569, Berzon, J., *concurring in part and dissenting in part* (the "some evidence" rule must be applied in light of the deference owed to the factual determinations of state courts under AEDPA).

The only reasoned state court decision to address Sargent's challenges to the Board's 2006 parole denial is the Amador County Superior Court's February 7, 2007 Order denying her habeas corpus relief. (Dkt No. 1, Pt. 1, pp. 41-42.)  That Order provides, in its entirety:

> The Court has read and considered the petition for a writ of habeas corpus filed by petitioner GINA SARGENT, an inmate at Central California Women[]s' Facility.  The Court, having read and considered the petition, informal response, reply to informal response, and the respective supporting documents, hereby denies the petition.
>
> Petitioner challenges the decision of the Board of Parole Hearings finding her unsuitable for parole.
>
> In reviewing the decision of the Board of Parole Hearings, the court is to consider whether there is some evidence to support the decision to deny parole. (In re Rosenkrantz (2002) 29 Cal.4th 616.)  In this instance, there was some evidence to support the Parole Board's decision.  [¶]  Therefore, the instant petition is denied.

(Dkt No. 1, Pt. 1,  pp. 41-42.)

The Superior Court does not reveal "*how*" it may have applied the "some evidence" of public danger standard in reaching that conclusion.  *See* Pearson, 606 F.3d at 609.  The court summarily recites it "read and considered" the parties' arguments and supporting documents and found some (unspecified) evidence "to support the Parole Board's decision."  While "the court's review is limited to ascertaining whether there is some evidence in the record that supports" the ultimate determination the inmate's release would unreasonably endanger public safety (Rosenkrantz, 29 Cal. 4th at 676-77), the Superior Court in Sargent's case relegates its analysis to arrive at that conclusion to the reader's conjecture.  While federal habeas courts applying AEDPA must accord considerable deference to the state court's factual findings in support of its decision (28 U.S.C. § 2254(e)(1)), the Superior Court here made no factual findings.  The terse Order does not demonstrate the state court actually applied California's "detailed standards" for review of parole denials.

Despite the state court's opaque decision, this Court's role is to determine whether the state court *result* in upholding the parole denial was a reasonable application of the California "some evidence" standard and was not the result of an unreasonable determination of the facts from the record.  Hayward, 603 F.3d at 562-63.  As elaborated above, "[u]nder the statute and governing regulations, the circumstances of the commitment offense (or any of the other factors related to

- 21 -

07cv1448

1   unsuitability) establish unsuitability if, and only if, those circumstances are probative to the

2   determination that a prisoner remains a danger to the public."  Lawrence, 44 Cal.4th at 1212. The

3   Court must answer the question whether the decision to deny Sargent parole is supported by "some

4   evidence" probative of her current unsuitability for release on public safety grounds.  *See* Hayward,

5   603 F.3d at 562-63; *see also* Lawrence, 44 Cal.4th at 1212 ("the relevant inquiry is whether some

6   evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat

7   to public safety").

8          The due process standard requires a rational nexus between the prisoner's "current

9   circumstances" and a finding of public safety risk in order "to provide the 'modicum of evidence'

10   necessary" for a legitimate denial of parole.  Lawrence, 44 Cal.4th at 1227.  Nevertheless, "[t]he nature

11   of the prisoner's offense alone can constitute a sufficient basis for denying parole," and "the authority

12   properly may weigh the degree of violence used and the amount of viciousness shown by a defendant,"

13   as long as the decision reflects "individualized treatment and due consideration" of all relevant and

14   reliable information. Rosenkrantz, 29 Cal.4th at 682-84; *see* Hayward, 603 F.3d at 562 (the "prisoner's

15   aggravated offense does not establish current dangerousness 'unless the record also establishes that

16   something in the prisoner's pre- or post-incarceration history, or . . . current demeanor and mental state,

17   supports the inference of dangerousness'"), *quoting* Lawrence, 44 Cal.4th at 1210, 1213-14.

18          The transcript of the February 2006 suitability hearing demonstrates the panel gave Sargent

19   individualized consideration of the multiple factors supported by the evidence tending to show

20   suitability before basing its decision primarily on the unsuitability factor of the heinousness and cruelty

21   of the commitment offense.  The panel pointed to factors beyond the minimum elements of second

22   degree murder, signaling among other things:  the pattern of physical abuse in the one to two months

23   leading up to the child's death while in Sargent's custody, as substantiated in medical records; the

24   victim was a defenseless and vulnerable five-year-old girl; the provocation for the push down the stairs

25   was Sargent's characterization that the child was being "uncooperative;" and her delay in seeking

26   treatment despite the obvious head injury and other symptoms after the fall.  Those circumstances are

27   beyond the minimum elements for a second-degree murder conviction and also provide "some

28   evidence" for the panel's findings the circumstances of the crime demonstrate "an exceptionally callous

1   disregard for human suffering" and the "motive for the crime is inexplicable or very trivial in relation

2   the offense." CAL. CODE REGS., tit. 15 § 2402(c)(1)(D), (E).

3   　　　In addition, a central consideration in the panel's denial of parole appears to be Sargent's lack

4   of insight into the systematic abuse leading up to the death of her step daughter.  Failure to recognize

5   causative factors that led to a violent crime is probative of future dangerousness and thus supports a

6   denial of parole.  *See* In re Shaputis, 44 Cal. 4th at 1261 n.20.

7   　　　The panel in announcing its decision spoke favorably of Ms. Sargent's behavior in prison and

8   post-release plans.  The panel, however, provided the following advice about how to improve her

9   chances of parole:

10      　　　For your next hearing, you need to go through your Olsen Review, review the
      　　　Probation Report, review the crime reports. . . . And I'm not going to tell you anything
11      　　　more.  If you want to change anything for your next hearing, that's up to you.

12   (Dkt No. 16-1, 49:8-21.)  The panel then concluded by emphasizing that it was not denying parole

13   based on immutable factors:

14      　　　The scales are certainly going in your direction.  There's nothing you can do about
      　　　changing the crime, we all know that, but you might again want to review that Olsen
15      　　　File and those reports that I mentioned.  Okay?

16   (Id., 56:12-16.)  Sargent's letter from her attorney explaining the panel's reasoning, makes clear that

17   references to the probation report and the crime reports demonstrate the panel's concern that Sargent

18   does not have "a handle on the significant abuse. . . leading up to the event, and not that it was just an

19   isolated incident where something bad happened, but that this had been going on for one to two

20   months."[14]  (Dkt No. 1, p. 52.)

21   　　　This lack of insight could call into question the sufficiency of Sargent's explanation as to why

22   she will not have anger management issues outside of prison.  (*See, e.g.*, Dkt No. 16-1, 35:3-7 ( "I've

23   learned ways to deal with anger instead of just lashing out like I used to do at one time.").)  If Sargent

24

25   　　　[14] As noted above, these factors are discernable in the hearing transcript.  Moreover, the panel
26   need not explicitly articulate the connection between the systematic abuse leading up to the underlying
    crime and the possibility that Ms. Sargent will not adequately be able to deal with her anger outside
27   of prison. "There is. . . no requirement that the Board point out the particulars of the rational nexus
    between the evidence and [its] finding that Petitioner was not ready for parole; it was enough that the
28   Board pointed out the evidence it found relevant, and stated its conclusions." Wallach v. Hernandez,
    No. 06cv2279, 2010 U.S. Dist. LEXIS 72987, at *8 (S.D. Cal. July 20, 2010).

approaches anger management from the perspective of suppressing one-off incidents, she may not have addressed the root causes that led to the systematic abuse of her step-daughter.  When, as is the case here, "there is evidence in the record [that] supports the conclusion that the circumstances of the crime continue to be predictive of current dangerousness despite an inmate's discipline-free record during incarceration," parole may be properly denied.  In re Lawrence, 44 Cal. 4th at 1228; *see also* Morrison v. Carey, No. CIV S-06-284, 2009 U.S. Dist. LEXIS 113349, at *22-23 (E.D. Cal. Dec. 4, 2009); In re Shaputis, 44 Cal. 4th at 1261, n.20 ("[P]etitioner's failure to take full responsibility for past violence, and his lack of insight into his behavior, establish that the circumstances of petitioner's crime and violent background continue to be probative to the issue of his current dangerousness."); In re Lazor, 172 Cal. App. 4th 1185, 1202 (Cal. App. 6th Dist. 2009) ("An inmate's lack of insight into, or minimizing of responsibility for, previous criminality, despite professing some responsibility, is a relevant consideration.").

Ninth Circuit case law supports this conclusion.  In a recent decision, the court held that a parole board's *sole* reliance on "two immutable characteristics (commitment offense and criminal history)" could support a denial of parole.  Varner v. Brown, No. 05-16029, 2010 U.S. App. LEXIS 18015, at *2-5 (9th Cir. Cal. Aug. 26, 2010).  There, the parole board based its conclusion on the following facts:  "(1) [Petitioner] carried out his commitment offense 'in an especially cruel and callous manner' and his motive 'was inexplicable or very trivial'; and (2) [Petitioner] had a prior criminal history involving the infliction or attempted infliction of serious injury on a victim."  Id. at *3.  Both of these facts are present in the instant case.  As noted in the panel's decision, "The crime in this case is certainly cruel and callous. . . . The crime was inexplicable in terms of motive."  (Dkt No. 16-1, 50:19-20, 51:1-2.)  And although Sargent had no prior criminal record, she had engaged in systematic abuse of the victim prior to the life crime.

Moreover, the evidence before Sargent's panel went beyond the pre-conviction facts that the Ninth Circuit found sufficient to support a denial of parole in Varner.  As noted above, the panel was concerned about Sargent's failure to adequately acknowledge the pattern of abuse leading up to her life offense, a fact probative of future dangerousness.  This fact likely would have satisfied the dissenting judge in Varner, who pointed to a series of Ninth Circuit cases including Cooke v. Solis,

606 F.3d 1206, 1208, 1216 (9th Cir. 2010), for the proposition, "Where the Board denies parole to a prisoner in a case where the sentencing judge found the possibility of parole appropriate, the 'some evidence' rule requires that the Board rely on something more than pre-conviction factors." <u>Varner</u>, 2010 U.S. App. LEXIS 18015, at *9 (Pregerson, J., dissenting).

Although the facts of <u>Cooke</u> share some similarities with the instant case, <u>Cooke</u> does not direct a conclusion that Sargent's parole board's decision was unreasonable.  In <u>Cooke</u>, the board denied petitioner's parole, stating in relevant part:

> [T]he prisoner does need self-help and/or therapy programming in order to face, discuss, understand, and cope with stress in a nondestructive manner.  And to face, discuss, and understand the causative factors that led to the life crime.  Until progress is made, he continues to be unpredictable and a threat to others.

<u>Cooke</u>, 606 F.3d at 1211-12.  In granting petitioner's habeas appeal, the Ninth Circuit did not dispute that failure to understand causative factors leading to a life crime could support a finding of future dangerousness.  Instead, the court found that the evidence before the parole board did not support a finding that petitioner could benefit from additional self-help programming:

> Cooke has received numerous accolades for his extensive participation in self-help groups and programming; indeed, he has designed such programming and is now leading such groups.  Nothing in the record so much as hints at the possibility that Cooke might need further programming in order to become non-dangerous, or even that he suffered from stress of any kind while in prison.  Accordingly, the Board's bare assertion that Cooke needs additional programming cannot reasonably be viewed as providing evidence that supports a finding of current dangerousness.

<u>Id.</u> at 1215.  In contrast, here, the board praised Sargent's engagement in self-help opportunities but noted that she should review documents–her Probation Report and crime reports–which could help provide insight into the abusive acts preceding her life offense.  Thus, unlike the situation in *Cooke*, evidence before the board supported a finding that Sargent had not adequately targeted behavior that preceded the life offense, a potential indicator of future dangerousness.

The Court may not substitute its own weighing of the evidence for that of the state authorities.  *See* <u>Rosenkrantz</u>, 29 Cal. 4th at 677.  The Court finds from its independent review of the record the Board's February 2006 decision "reflects due consideration of the specified factors applied to the individual prisoner in accordance with applicable legal standards."  <u>Id.</u> at 676-77.  Due process is satisfied when, as here, the parole denial "*decision* is supported by" at least "a modicum of evidence."

07cv1448

Id. (emphasis added). The state court's upholding of that result therefore did not entail an unreasonable application of the California "some evidence" requirement, nor was it "based on an unreasonable determination of the facts in light of the evidence." Hayward, 603 F.3d at 562-63, *quoting* 28 U.S.C. §§ 2254(d)(1)-(2). Sargent is accordingly not in custody "in violation of the Constitution or laws or treaties of the United States," foreclosing federal habeas relief. 28 U.S.C. § 2254(a).

## III.    CONCLUSION AND ORDER

        For all the foregoing reasons, the Court finds no due process violation accompanied Sargent's denial of parole in February 2006 because "some evidence" supported a reasonable inference of present dangerousness, as required under the California statute creating a liberty interest in parole. *See* Hayward, 603 F.3d at 561-62; Pearson, 606 F.3d at 608-09. The Court notes Sargent filed a Supplement to her Traverse informing the Court she was found suitable for parole at a Board hearing on December 19, 2007, after the February 2006 suitability hearing forming the subject matter of this Order. (Dkt No. 24.) The Governor of California reversed that decision, and Sargent states she is pursuing habeas relief from that result through the state courts, a process she had not yet completed. (Id., p. 2.) That subsequent history and any issues raised there are not before this Court at this time through this Petition. **IT IS HEREBY ORDERED** Sargent's Petition is **_DENIED_**, and judgment shall be entered accordingly. The Court **_GRANTS_** a certificate of appealability on the issue of whether the state court's determination that there was some evidence supporting the parole board's decision was unreasonable. This grant of a certificate of appealability is not a substitute for complying with all appellate rules. Petitioner is reminded that she still must file a timely Notice of Appeal.

        **IT IS SO ORDERED**.

Dated: November 2, 2010

**HONORABLE BARRY TED MOSKOWITZ**
**UNITED STATES DISTRICT JUDGE**

07cv1448